1  KEITH L. SLENKOVICH (SBN 129793)
   keith.slenkovich@wilmerhale.com
2  TIMOTHY TATARKA (SBN 277219)
   timothy.tatarka@wilmerhale.com
3  EUGENE MARDER (SBN 275762)
   eugene.marder@wilmerhale.com
4  ANDREW L. LIAO (SBN 271219)
   andrew.liao@wilmerhale.com
5  WILMER CUTLER PICKERING
        HALE AND DORR LLP
6  950 Page Mill Road
7  Palo Alto, California  94304
   Telephone:  (650) 858-6000
8  Facsimile:  (650) 858-6100
9
10  Attorneys for *Amicus Curiae*
   THE ASIAN LAW CAUCUS
11  CENTRO LEGAL DE LA RAZA
   DOLORES STREET COMMUNITY SERVICES
12

13              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
14

15  UELIAN DE ABADIA-PEIXOTO, ESMAR
   CIFUENTES, PEDRO NOLASCO JOSE, and
16  MI LIAN WEI on behalf of themselves and all        Case No.  11-cv-4001 (RS)
   others similarly situated,
17
                        Plaintiffs,              **BRIEF OF *AMICUS CURIAE* IN**
18                                               **SUPPORT OF PLAINTIFFS'**
            vs.                                  **OPPOSITION TO DEFENDANTS'**
19                                               **MOTION TO DISMISS**
   JANET NAPOLITANO, Secretary of the
20  Department of Homeland Security, UNITED
   STATES IMMIGRATION AND
21  CUSTOMS ENFORCEMENT, JOHN T.
   MORTON, Director of U.S. Immigration
22  and Customs Enforcement, TIMOTHY
   AITKEN, Field Office Director of the San
23  Francisco District of U.S. Immigration and
   Customs Enforcement, ERIC H. HOLDER,
24  JR., Attorney General, THE EXECUTIVE
   OFFICE FOR IMMIGRATION REVIEW,
25  and JUAN P. OSUNA, Acting Director of
   the Executive Office for Immigration
26  Review,
27                        Defendants.
28

I.     INTRODUCTION

The indiscriminate shackling of immigrant detainees during courtroom appearances degrades the integrity of deportation proceedings, is an affront to the personal dignity of immigration detainees, and directly impedes the ability of attorneys to effectively communicate with—and represent—their clients.  This policy discourages immigrant detainees from confidentially, candidly, and accurately communicating with their attorneys, thereby undermining these attorneys' ability to represent their clients.  Shackling also unnecessarily subjects detainees to physical pain and humiliation, prejudicing their ability to participate in their own defense and depriving them of a fair opportunity to tell their story to the immigration judge who will decide whether they may stay in this country.  The *amici* organizations, on the basis of their collective experience representing and supporting immigrant detainees, hereby offer their perspective and analysis to assist the Court in its deliberation with respect to the pending motion to dismiss.

II.    IDENTITY, INTEREST, AND EXPERTISE OF *AMICI CURIAE*

The *amici* are non-profit organizations dedicated to preserving and enforcing civil rights and liberties.  These organizations have extensive experience and insight regarding the subject matter addressed in this brief: the damage caused by the policy of shackling immigrant detainees with respect to an attorney's ability to effectively and ethically represent immigrant clients.  Among them, the three *amici* organizations have represented more than 600 detainees in the past five years.

- **The Asian Law Caucus,** ("ALC") founded in 1972, serves the legal and civil rights needs of low-income Asian Pacific American communities.  The ALC's Immigration Project supports individuals in connection with issues such as detention, deportation, and related constitutional and due process rights.

- **Centro Legal de la Raza**, ("Centro Legal") founded in 1969, provides free or low-cost, bilingual, culturally-sensitive legal aid, community education and

advocacy for low-income residents of the Bay Area, including monolingual Spanish speaking immigrants.  Centro Legal's Immigration Law Program provides legal representation to individuals and families seeking naturalization and lawful status, as well as those in removal and bond proceedings.

- **Dolores Street Community Services** ("DSCS") provides community outreach services and pro bono deportation defense to low-income immigrants.  DSCS is an active participant in the San Francisco Immigrant Legal & Education Network (SFILEN), which supports immigrants facing deportation in removal proceedings. DSCS specializes in representing individuals arrested during civil immigration workplace or home raids.

The current practice of shackling all immigrant detainees, whether or not they pose a flight risk or have any history of violent behavior, directly impedes the ability of the *amici* organizations to represent their clients because of the obstacles to communication and privacy that this practice of shackling erects.  *Amici's* interests in protecting the right of immigrant detainees to have their voices heard, as well as preserving the principles underlying attorney-client privilege, unite them in their opposition to Defendant's motion to dismiss, and in support of Plaintiffs' case.

## III.   THE POLICY OF SHACKLING AND ITS PRACTICAL IMPACT ON THE REPRESENTATION OF IMMIGRANT DETAINEES

On the day of her San Francisco Immigration Court hearing—one of several hearings that each immigrant detainee in U.S. custody will likely have to attend—a typical detainee will spend ten hours in cumbersome shackles that bind her feet together and her hands to her waist.  She may have been roused at two in the morning in order to be transported to the courtroom in time for the hearing, and will spend this time in shackles.  She will sit in the gallery, chained to several other detainees.  She may be meeting a lawyer for the first time in court, while within earshot of several other detainees.  If she fled her home country to escape rape, torture, or other atrocities, she will have to decide whether to disclose the true nature of this persecution, knowing that the detainees she is chained to will hear these deeply personal and humiliating details. When her lawyer presents her defense to the judge, she will be unable to write her lawyer a note,

ask him to pause, or even clearly hear what is being said from her location in the gallery.  If the presiding judge asks her a question, she will be unable to gesture or to handle or review documents.  If called to testify on her own behalf, she will be forced to contend with the sense of shame and judgment of being bound hand and foot as she attempts to tell the story of her fear of persecution or her family's hardship, on which her ability to remain in the United States may hinge.  Throughout this process, the heavy shackles will aggravate wounds, restrict her circulation, cause soreness and bruising—all distracting her from meaningful understanding of, or participation in, the proceeding.

The immigrant detainee is shackled not because the court determined her to be a danger to others or a flight risk—Defendants' indiscriminate shackling policy does not provide for individualized determinations.  Rather, each and every immigrant detainee is subject to similarly humiliating, demoralizing, and painful treatment during routine hearings before the San Francisco Immigration Court.  These practices offend the most basic notions of due process.

The policy of indiscriminately shackling immigrants for courtroom appearances significantly undermines the effective assistance of counsel that can be provided by *amici*.  Many of the detainees find themselves in detention pending their application for asylum, a petition under the Violence Against Women Act, or cancellation of removal based on family hardship. The circumstances giving rise to these applications involve highly sensitive and personal details that an applicant will be reluctant to share in the open forum created by the indiscriminate practice of shackling.  Whether these circumstances include conditions of rape, torture, or other details of personal humiliation, an applicant will understandably be uncomfortable sharing such details in open proximity to other applicants.  Likewise, where the applicant has fled from persecution within a region composed of warring political factions, she may fear that, by

discussing these details in proximity to others in the courtroom who may be connected to opposing political factions, the candid disclosure of these details will place family members still living in her home country at risk of retribution.  Finally, applicants often suffer from mental and/or physical disabilities that, coupled with the practice of shackling, render any meaningful assistance of counsel illusory.  For example, if an applicant is deaf, and can only communicate through sign language, the shackling of wrists prevents any communication with counsel at all.

For these reasons, the practical impact of the challenged policy—indiscriminately shackling immigrant detainees during courtroom appearances—is to undermine the integrity of deportation proceedings, affront the personal dignity of immigration detainees, and impede the ability of attorneys to effectively communicate with, and represent, their detainee clients.

## IV.    ARGUMENT

It is well understood that deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom," and as a consequence "[m]eticulous care must be exercised lest the procedures by which [an alien] is deprived of that liberty not meet the essential standards of fairness."  *Hernandez-Gil v. Gonzales*, 476 F.3d 803, 806 (9th Cir. 2007) (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)); *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1162 (9th Cir. 2005) ("Immigration proceedings, although not subject to the full range of constitutional protections, must conform to the Fifth Amendment's requirement of due process.").  Defendants' policy of forcing *all* immigration detainees to attend their hearings bound by the hand, foot, and waist in chains without any determination of their risk of violence, flight, or disruption is a blatant deviation from these standards of fairness and due process.  In addition to undermining the dignity and decorum of the

hearings, this indiscriminate full-body shackling effectively deprives Plaintiffs of the right to counsel as well as any meaningful opportunity to participate in their own defense.

**A.      Shackling Effectively Deprives Detainees of Their Right to Counsel**

"The high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel."  *Hernandez-Gil*, 476 F.3d at 806 (quoting *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005)).  Recognizing this need, Congress created a statutory right to counsel for those facing critical and complex immigration proceedings.  *See* 8 U.S.C. §§ 1229a(b)(4)(A) and 1362; *see also Cano-Merida v. INS*, 311 F.3d 960, 964 (9th Cir. 2002) (stating that an immigrant is entitled to a full and fair hearing of his or her claims and a reasonable opportunity to present evidence).  This statutory right to counsel at immigration proceedings "stems from a constitutional guarantee of due process."  *See Hernandez-Gil*, 476 F.3d at 806; *Ray v. Gonzales*, 439 F.3d 582, 587 (9th Cir. 2006).

The Ninth Circuit has made clear that the "importance of the right to counsel, whether it is guaranteed by the Constitution or by Congressional action, cannot be overstated."  *Hernandez-Gil*, 476 F.3d at 806.  Accordingly, courts require that the right to counsel include a genuine opportunity for an attorney to consult with the detainee and stage a defense.  *See id* ("The statutory right to counsel exists so that an alien has a competent advocate acting on his or her behalf at removal proceedings"); *Biwot*, 403 F.3d at 1098-99 ("To infuse the critical right to counsel with meaning, we have previously held that [immigration judges] must provide aliens with reasonable time to locate counsel and permit counsel to prepare for the hearing.").

Defendants' blanket shackling policy impairs the ability of counsel to serve as competent advocates for immigrants facing removal proceedings.  Shackling—particularly shackling together multiple detainees—vitiates the right of detainees to confidential communications with

counsel, impedes counsel's ability to elicit candid information from clients, and renders it impossible for counsel to conduct adequate investigation at a crucial phase of removal proceedings.

The right to counsel encompasses the right to confer in confidence with an attorney. *See e.g.*, *United States v. Henry*, 447 U.S. 264 (1980); *Geders v. United States*, 425 U.S. 80 (1976). The Supreme Court has recognized that "the role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance." *Geders*, 425 U.S. at 88. Such consultation is particularly important in the immigration context. As the Ninth Circuit has observed, "it is difficult to imagine a layman more lacking in skill or more in need of the guiding hand of counsel[] than an alien who often possesses the most minimal of educations and must frequently be heard not in the alien's own voice and native tongue, but rather through an interpreter." *Hernandez-Gil*, 476 F.3d at 806.

When a detainee is physically shackled to other detainees, the attorney-client privilege is put in jeopardy, *see Suburban Sew 'N Sweep v. Swiss-Bernina*, 91 F.R.D. 254, 258 (N.D. Ill. 1981) (collecting cases stating that the presence of a third party waives attorney client privilege), a fact that counsel may be obliged to inform their client. *Restatement of the Law Governing Lawyers* § 68(3). Yet, as a practical matter, the brief interaction during a court appearance may be the only opportunity a detainee has to obtain legal advice before critical decisions are made in their case. Forcing detainees to conduct such consultations while bound hand and foot and fastened to other inmates substantially burdens—if not denies—the right to counsel guaranteed by statute and the Fifth Amendment. *Cf. DeRoche v. United States*, 337 F.2d 606, 607 (9th Cir. 1964) ("[T]ime for preparation permitting merely a perfunctory appearance on behalf of the defendant fails to redeem the constitutional guarantee.").

Even when the client is not chained to other detainees during the proceeding, the blanket shackling policy severely impedes attorney-client communications. The importance of "full and frank communication between attorneys and their clients" has been recognized for centuries. *Swidler & Berlin et al v. United States*, 524 U.S. 399, 403 (1998) (citing *Upjohn v. United States*, 449 U.S. 383, 389 (1981)). Candid disclosure from a client is necessary for the lawyer to be able to adequately represent the client. *Upjohn*, 449 U.S. at 389 ("[S]ound legal advice or advocacy . . . depends upon the lawyer's being fully informed by the client."). When immigration detainees, who "often possess[] the most minimal of educations" and often cannot understand English, *Hernandez-Gil*, 476 F.3d at 806, are forced into full body shackles without assessment of their risk of violence or flight, conducting a candid client interview is extremely difficult. It is particularly difficult to obtain necessary private details about persecution from aliens seeking asylum, who, after having suffered persecution at the hands of one government, have been clapped in irons by another. Where an attorney is unable to conduct a basic investigation with respect to the legal issues which may be in play, even the most diligent attorney cannot provide competent counsel. 8 C.F.R. § 1003.102(o) ("Competent handling of a particular matter [before the Immigration Courts] includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners"); *see also* Model Rules of Prof'l Conduct R. 1.1 cmt. 5 (2002) ("Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem[.]"). The use of full body shackles necessarily intimidates immigration detainees, thereby impermissibly chilling attorney-client communications and hampering detainees' ability to obtain competent counsel.

The Plaintiffs' Complaint establishes "a claim for relief that is plausible on its face," *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and contains ample factual allegations that indicate specific instances in which named Plaintiffs, and Plaintiffs as a class, have had and will continue to have their right to effective counsel violated by ICE's indiscriminate shackling practice in San Francisco Immigration Court. As stated in the Complaint, "[t]he mandatory use of in-court shackles . . . threatens the privacy and privilege of the attorney-client relationship." (Complaint, ¶ 41). This is a specific statement of harm, and cannot be characterized as conclusory or speculative. The Complaint describes routine hearings that every detainee attends, in which they "must remain handcuffed to other detainees while their attorney stands next to them in the gallery and attempts to whisper confidential, attorney-client privileged information. This information is easily overheard by the persons to whom they are handcuffed, who are, at most, one foot away." (*Id.* at ¶ 53). Because the detainee "is generally not permitted to approach his or her counsel's table" during the proceeding, the attorney must "request[] a moment to walk back to the gallery" in order to consult with the detainee, offer advice, or solicit crucial information—all within earshot of other detainees. (*Id.* at ¶¶ 54-55). The attorney-client privilege is destroyed if a detainee attempts to speak with counsel while chained to one or more people within earshot of the conversation. Without this privilege and the candor it facilitates, the detainee's right to counsel is vitiated. *See Weatherford v. Bursey*, 429 U.S. 545, 554 (n.4) (1977) ("[The] assistance of counsel guarantee can only be meaningfully implemented if a criminal defendant knows that his communications with his attorney are private[.]") (citation omitted)); *Bittaker v. Woodford*, 331 F.3d 715, 723 n.7 (9th Cir. 2003) (expounding on the connection between attorney-client

BRIEF OF *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
Case No. 11-cv-4001 (RS)

privilege and the right to effective counsel).  The Complaint's explicit statement regarding the impact of shackling on the attorney-client privilege therefore presents an actionable challenge.

Even setting aside the *ipso facto* dissolution of attorney-client privilege caused by shackling, the Complaint alleges that being chained to others "forc[es] detainees to disclose personal, sometimes humiliating, information within earshot of other detainees or otherwise risk withholding from their counsel information which could be crucial to their removal cases." (Complaint, ¶ 41).  The facts that may be critical to a detainee's argument for asylum—fear of "persecution based on [ ] HIV status, gender . . . sexual orientation, gender identity, or other protected grounds"—are difficult or even dangerous to utter in front of other detainees.  (*Id.* at ¶ 53).

Likewise, detainees fleeing political persecution justifiably fear the potential for retribution to self or family if they disclose the circumstances of their persecution within earshot of others who may be aligned with opposing political views.  *See e.g.*, *Matias-Zet v. Ashcroft*, 118 Fed. Appx. 246 (9th Cir. 2004) (granting asylum to Guatemalan guerilla fearing extra-judicial punishment from government forces); *Marroquin-Orantes v. Ashcroft*, 110 Fed. Appx. 783  (9th Cir. 2004) (granting asylum to a government supporter fearing threats from Guatemalan guerilla groups, decided only three months earlier).

By forcing immigration detainees to be "chained to other immigration detainees in such a fashion that [the detainee] could not speak confidentially with a consulting attorney"  (*Id.* at ¶ 78), detainees are thus forced to balance complete candor with their counsel, which is necessary to effective representation, against disclosure of sensitive, personal information to strangers. This is a clear impediment to the right to counsel and, as the Complaint states, a direct consequence of shackling.

BRIEF OF *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
Case No. 11-cv-4001 (RS)

Beyond detailing how shackling affects the *content* of a detainee's communication with counsel, the Complaint also describes how this practice affects her very *ability* to communicate effectively.  Detainees may not approach counsel during the proceedings, "jot notes to counsel," manipulate documents, or even gesture in conversation, let alone use sign language if that is their sole means of communication.  (*Id.* at ¶¶ 54, 56-58).  *Amici* organizations have experienced great difficulty providing legal advice and representation to their detainee clients, largely due to this practice of shackling.  Because communication with one's attorney is an essential part of receiving effective counsel, *see Upjohn*, 449 U.S. at 389, the Complaint's allegations regarding shackling, accepted as true, state a claim to relief that is both plausible and grave.

**B.    Shackling Deprives Detainees of the Right to Meaningfully Participate in Their Own Defense**

Defendants' indiscriminate shackling policy also intrudes upon detainees Fifth Amendment right to participate in their own defense.  The Ninth Circuit has recognized that in order to obtain a fair hearing a detainee must have a meaningful right to be heard, *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000), including the right to present evidence, *Ladha v. INS*, 215 F.3d 889, 905 (9th Cir. 2000), confront witnesses, *Saidane v. INS*, 129 F.3d 1063, 1065 (9th Cir. 1999), call witnesses, *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1075-76 (9th Cir. 2005) and, perhaps most important, to present affirmative testimony of her own, *Garcia v. INS*, 208 F.3d 725, 728-29 (9th Cir. 1999) (denial of asylum reversed because alien was not given an opportunity to present affirmative testimony).  A shackled detainee has no meaningful opportunity, for example, to write notes to her lawyer, let alone to review documents submitted to the Court by the government.  These rights are especially important in immigration hearings, where a detainee's opportunity to remain in this country often depends exclusively on whether she can persuade the trier of fact of her credibility on deeply personal issues such as fear of

BRIEF OF *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
Case No. 11-cv-4001 (RS)

persecution or extreme hardship.  *See* 8 U.S.C. § 1158(b)(ii) ("The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee"); 8 U.S.C. § 1229(a) ("In evaluating the testimony of the applicant . . . the immigration judge will determine whether or not the testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied the applicant's burden of proof.").

A detainee suffering from the physical pain and humiliation of being bound hand and foot has no meaningful opportunity to exercise these rights.  Courts have long recognized the impact of the pain "may confuse and embarrass the defendant, thereby impairing his mental faculties," *Spain v. Rushen*, 883 F.2d 712, 721 (9th Cir. 1989) (collecting cases); *Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir. 1999).  As the Ninth Circuit has noted in the context of stun belts, restraints may impose "a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case."  *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003).  The dangers of shackling are particularly pronounced when the detainee is called to testify.  Even assuming the trier of fact is not swayed by the presence of shackling, the sense of shame and judgment that accompanies shackling inevitably impacts a detainee's ability to tell her story in a credible and persuasive manner.

Detainees held with respect to deportation hearings are particularly vulnerable to the intimidation and humiliation caused by full-body shackling.  As the Ninth Circuit has observed, detainees "often possess[] the most minimal of educations,"  find the hearing an "unfamiliar setting[]," and "often lack proficiency in English."  *Hernandez-Gil*, 476 F.3d at 806; *Garcia*, 208 F.3d at 735.  At the same time, because detainees "often appear without counsel," *Garcia*, 208

F.3d at 735, the impact shackling has on their ability to conduct their own defense is particularly acute.  Moreover, detainees risk being torn from their life and family in the United States, and in the case of asylum applicants "face a significant threat to his or her life, safety, and well-being" if returned to their home country.  *Garcia*, 208. F.3d at 735.  Often a detainee's ability to remain in the United States hinges on how credibly and persuasively she can convey personal details, yet as the attorneys involved in the *amici* organizations have observed time after time, the dehumanizing impact of being bound hand and foot makes it extremely difficult for individuals to open up about these private matters.  As the Complaint illustrates, detainees' exercise of their right to present affirmative testimony is unduly chilled by forced shackling.

The facts alleged in the Complaint specifically describe the existing and potential physical and emotional impacts that shackling has on detainees, and thereby establish an actionable claim for the relief sought by Plaintiffs.  First, each of the four named Plaintiffs has stated facts demonstrating how shackling has impaired their ability to conduct their respective defenses in the San Francisco Immigration Court.  Ms. De Abadia-Peixoto and Mr. Cifuentes have been unable to raise their hands to be sworn in during court proceedings due to shackling (Complaint, ¶¶ 71, 79), and Mr. Cifuentes has been so distracted by the pain and discomfort caused by his shackles that he could not concentrate or be responsive in court.  (*Id.* at ¶ 80).  He and Ms. Nolasco have felt so shamed by the seemingly punitive act of shackling that they cannot confidently and accurately answer questions in court.  (*Id.* at ¶¶ 83, 90).  Shackles also "inflict pain on detained immigrants when they attempt to review and/or sign documents presented to them, to scratch an itch or wipe away tears. . . . [and] prevent detainees from . . . gesturing while testifying . . . and taking notes during the course of a proceeding where they may be representing

themselves."  (*Id.* at ¶ 41).  These obvious consequences of being shackled in court are critical

limitations to a detainee's ability to present a defense during an immigration proceeding.

Aside from the express physical restraint and inability to mount a defense during the

proceedings, the physical pain and humiliation resulting from in-court shackling, as described in

the Complaint, necessarily impacts a litigant's performance during a proceeding.  *See, e.g.*,

*Spain*, 883 F.2d at 721; *Rhoden*, 172 F.3d at 637.  The metal shackles, worn by detainees during

the hours-long journey from the detention center and throughout the entire day in court, are

painful.  One Plaintiff was forced to tears as the shackles aggravated an existing injury

(Complaint, ¶ 72), and each Plaintiff has experienced bruising, swelling, and resulting pain (*Id.*

at ¶¶ 72, 80, 89, 95).  The act of shackling Plaintiffs' ankles, waist, and wrists while being

chained to other detainees has caused each Plaintiff to experience humiliation, discouragement

and a sense of being punished.  (*Id.* at ¶¶ 59, 75, 82, 90, 96).  This sort of pain and

embarrassment has not been accepted lightly in American courtrooms, and has only been

tolerated in limited cases where an individual has been determined to pose an immediate danger

or flight risk.  *See e.g.*, *Deck v. Missouri*, 544 U.S. 622 (2005); *Illinois v. Allen*, 397 U.S. 337

(1970).  For the Plaintiffs, as stated in the Complaint, indiscriminate shackling has no

prophylactic effect, but does substantially interfere with detainees' ability to present a competent

defense in San Francisco Immigration Court.  Indeed, the Complaint describes with particularity

the physical and emotional pain that shackled detainees experience, all while participating in a

proceeding that could determine whether they will be sent back to the country from which they

may have fled in search of justice and freedom from violence.

### C.      Shackling Deprives Detainees of Their Right to a Fair Hearing by Undermining the Dignity of the Proceedings

Shackling is an affront to the very "dignity and decorum of judicial proceedings." *Deck*, 544 U.S. at 631-32; *United States v. Howard*, 429 F.3d 843, 851 (9th Cir. 2005).  As the Supreme Court explained, "[t]he courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue . . . and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment." *Deck*, 544 U.S. at 631.  In San Francisco Immigration Court, the rattle of shackles and the shouted responses of detainee-defendants who are forced to sit in the gallery disturb what should be a solemn proceeding.  Depriving a courtroom of such dignity undermines public confidence in the immigration system.  *Id.*

The principle that "no person should be tried while shackled and gagged except as a last resort," applies with equal force to deportation hearings.  *Allen*, 397 U.S. at 344.  Not only are the consequences of the proceedings life-altering for the detainee, but the hearings are one of the faces the United States justice system presents to the world.  Just as in criminal trials, "routine use of shackles" in immigration proceedings undermines the "symbolic yet concrete" objective of assuring the public both in our country and across the globe that, under our system, all stand equal before the law.  *Deck*, 544 U.S. at 631.

In light of this imperative to maintain the dignity of the courtroom, the Complaint's statements regarding the effects of shackling constitute an actionable claim to relief.  This policy indiscriminately forces every detainee to don full-body restraints, "including refugees fleeing persecution and torture in their native countries, the elderly, and the physically and mentally disabled."  (Complaint, ¶ 36).  Moreover, the policy does not consider the effect on those who "may have endured torture or abuse involving restraints" in the country that they fled from to

seek asylum here. (*Id.* at ¶ 60).  No individualized determination regarding flight risk or danger is made before restraining detainees in the courtroom, yet "being forced to wear shackles falsely portrays them as serious and violent criminals."  (*Id.* at ¶ 38).  Indeed, as stated in the Complaint, "immigration detainees consistently describe their experience of shackling as humiliating, embarrassing, and unfair." (*Id.*).  The promise and virtue of the American courtroom is that each individual is afforded dignity and respect.  The unconscionable reality of San Francisco Immigration Court Proceedings, as duly described in the Complaint, is best summed up by Plaintiff Uelian De Abadia-Peixoto: "by forcing her to appear during her court proceedings in shackles, Defendants 'treat her like nothing[.]'"  (*Id.* at ¶ 75).  Our Constitution demands better.

## V.        CONCLUSION

For the foregoing reasons, *amici* the Asian Law Caucus, Centro Legal de la Raza, and Dolores Street Community Services respectfully urge the Court to deny Defendants' Motion to Dismiss.

Dated:  November 1, 2011                               /s/ Keith Slenkovich
                                                      Keith Slenkovich (SBN 129793)
                                                      (keith.slenkovich@wilmerhale.com)
                                                      WILMER CUTLER PICKERING
                                                         HALE AND DORR LLP
                                                      950 Page Mill Road
                                                      Palo Alto, California  94304
                                                      Telephone:  (650) 858-6000

                                                      Attorney for *Amicus Curiae*
                                                      THE ASIAN LAW CAUCUS
                                                      CENTRO LEGAL DE LA RAZA
                                                      DOLORES STREET COMMUNITY
                                                      SERVICES

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document has been served on November 1, 2011, upon the following:

Jeffrey Michael Bauer
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
Email: jeffrey.bauer@usdoj.gov

Theodore W Atkinson
United States Department of Justice
Office of Immigration Litigation - District Court Section
Box 868, Ben Franklin Station
Washington, DC 20044
Email: theodore.atkinson@usdoj.gov

Erez R Reuveni
United States Department of Justice
450 5th St Nw
Washignton, DC 20530
Email: erez.r.reuveni@usdoj.gov

Alan Lawrence Schlosser
ACLU Foundation of Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Email: aschlosser@aclunc.org

Analisa M Pratt
Wilson Sonsini et al
650 Page Mill Rd
Palo Alto, CA 94304
Email: apratt@wsgr.com

Audrey Daniel
Lawyers' Committee For Civil Rights
131 Steuart St.
Suite 400
San Francisco, CA 94105
Email: audrey.daniel@gmail.com

Catherine Moreno
Wilson Sonsini Goodrigh & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050

David J. Berger
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
Email: dberger@wsgr.com

Julia Harumi Mass
American Civil Liberties Union of Northern California, Inc.
39 Drumm Street
San Francisco, CA 94111
Email: jmass@aclunc.org

Paul R. Chavez
Lawyers' Committee for Civil Rights
131 Steuart Street
San Francisco, CA 94105
Email: pchavez@lccr.com

Philip Kim Hwang
Lawyers' Committee for Civil Rights
of the San Francisco Bay
131 Steuart Street, No.400
San Francisco, CA 94105
Email: phwang@lccr.com

Savith S. Iyengar
Wilson Sonsini Goodrich and Rosati
1 Market Street
Spear Tower, Suite 3300
San Francisco, CA 94105
Email: siyengar@wsgr.com

Thomas James Martin
Wilson Sonsini et al
650 Page Mill Road
Palo Alto, CA 94304
Email: tmartin@wsgr.com


Dated:  November 1, 2011                     /s/ Keith Slenkovich
                                        _____
                                        Keith Slenkovich